**FILED IN OPEN COURT**
JACKSONVILLE, FLORIDA

8/4/2025

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                     CASE NO. 3:24-cr-251-MMH-SJH

RUBY GEORGE

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Gregory W. Kehoe, United States Attorney for the Middle District of Florida, and the defendant, RUBY GEORGE, and the attorneys for the defendant, Reid M. Hart and John M. Phillips, mutually agree as follows:

**A.    Particularized Terms**

1.    Counts Pleading To

The defendant shall enter a plea of guilty to Counts One, Five, and Twelve of the Indictment. Count One charges the defendant with Conspiracy to Commit Wire Fraud and Mail Fraud in violation of 18 U.S.C. § 1349. Count Five charges the defendant with Aiding and Abetting Wire Fraud in violation of 18 U.S.C. §§ 1343 and 2. Count Twelve charges the defendant with Aiding and Abetting Mail Fraud in violation of 18 U.S.C. §§ 1341 and 2.

2.    Maximum Penalties

Counts One, Five, and Twelve each carry a maximum sentence of 20 years of imprisonment, a fine of $250,000 or twice the gross gain or loss caused by the offense, whichever is greater, a term of supervised release of not more than three years,

Defendant's Initials _____                    AF Approval __JMH__

and a special assessment of $100. A violation of the terms and conditions of supervised release carries a maximum sentence of up to two years of imprisonment, as well as the possibility of an additional term of supervised release.

Cumulatively, the defendant faces the following maximum penalties: not more than 60 years of imprisonment, a fine of $750,000 or twice the gross gain or loss ~~caused by the offense~~ *for each count she is pleading guilty to,* whichever is greater, a term of supervised release of not more than three years, and special assessment of $300. A violation of the terms and conditions of supervised release carries a maximum sentence of up to six years of imprisonment, as well as the possibility of an additional term of supervised release.

With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offenses, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offenses, or to the community, as set forth below.

3.  <u>Elements of the Offenses</u>

The defendant acknowledges understanding the nature and elements of the offenses with which defendant has been charged and to which defendant is pleading guilty.

The elements of Count One are:

<u>First</u>:     Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit wire fraud and mail fraud ~~in violation of 18 U.S.C. § 1349~~; and

<u>Second</u>:     The defendant knew the unlawful purpose of the plan and willfully joined in it.



The elements of Count Five are:

First:          The defendant knowingly devised or participated in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises;

Second:         The false pretenses, representations, or promises were about a material fact;

Third:          The defendant acted with intent to defraud; and

Fourth:         The defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud.

The elements of Count Twelve are:

First:          The defendant knowingly devised or participated in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises;

Second:         The false pretenses, representations, or promises were about a material fact;

Third:          The defendant acted with intent to defraud; and

Fourth:         The defendant used the United States Postal Service by mailing or by causing to be mailed or a private or commercial interstate carrier by depositing or causing to be deposited with the carrier something meant to help carry out the scheme to defraud.

4.    Counts Dismissed

At the time of sentencing, the remaining counts against the defendant, Count Two through Four and Six through Eleven will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

Defendant's Initials _____          3

5.    <u>Chapters Two and Three – Guidelines Stipulation and Estimate</u>

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States and the defendant jointly recommend to the Court that the defendant's Chapter Two and Three guidelines scoring is as follows:

| Guideline | Description | Levels |
|---|---|---|
| § 2B1.1(a)(1) | Base Offense | 7 |
| § 2B1.1(b)(1)(I) | Specific Offense Characteristic | +16 |
| § 3B1.3 | Abuse of Position of Trust | +2 |
| § 3E1.1(b) | Acceptance of Responsibility | -3 |
| Total Adjusted Offense Level | | 22 |

The parties understand that this estimate is not binding on the Court, and if the Court calculates the Chapter 2 and 3 Guidelines differently, neither the United States or the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from her plea of guilty.

6.    <u>Acceptance of Responsibility – Three Levels</u>

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The

defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

7.   <u>Cooperation – Substantial Assistance to be Considered</u>

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents,

Defendant's Initials _____         5

and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require.

If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

8.    Use of Information – Section 1B1.8

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining

Defendant's Initials _____                    6

the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

9.    <u>Cooperation – Responsibilities of Parties</u>

a.    The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime.  However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b.    It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1)    The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2)    The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement.  With regard to

Defendant's Initials _____    7

such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recission of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)    The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)    The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

Defendant's Initials _____ .          8

(5)    The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

10.    Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), whether in the possession or control of the United States, the defendant or defendant's nominees.  The assets to be forfeited specifically include, but are not limited to, the $1,271,540.71 in proceeds the defendant admits she obtained, as the result of the commission of the offenses to which the defendant is pleading guilty.  The defendant acknowledges and agrees that: (1) this amount was obtained as a result of the commission of the offenses, and (2) as a result of the acts and omissions of the defendant, the proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence.  Therefore, the defendant agrees that, pursuant to 21 U.S.C. § 853(p), the United States is entitled to forfeit any other property of the defendant (substitute assets), up to the amount of proceeds the defendant obtained, as the result of the offenses of conviction.  The defendant further consents to, and agrees not to oppose, any motion for substitute assets filed by the United States up to the amount of proceeds

Defendant's Initials _M R K_                    9

obtained from commission of the offenses and consents to the entry of the forfeiture order into the Treasury Offset Program. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

The defendant additionally agrees that since the criminal proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence, the preliminary and final orders of forfeiture should authorize the United States Attorney's Office to conduct discovery (including depositions, interrogatories, requests for production of documents, and the issuance of subpoenas), pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, to help identify, locate, and forfeit substitute assets.

The defendant also agrees to waive all constitutional, statutory, and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is

Defendant's Initials _M_ _AF_                10

omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all substitute assets and to transfer custody of such assets to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to any substitute assets before the defendant's sentencing. In addition to providing full and complete information about substitute assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

Defendant's Initials _____        11

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

**B.**    **Standard Terms and Conditions**

1.    Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the

Defendant's Initials ___    12

Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. To ensure that this obligation is satisfied, the Defendant agrees to deliver a cashier's check, certified check, or money order to the Clerk of the Court in the amount of $300, payable to "Clerk, U.S. District Court" within ten days of the change of plea hearing. The defendant understands that this agreement imposes no limitation as to fine.

2.    <u>Supervised Release</u>

The defendant understands that the offenses to which the defendant is pleading provide for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.    <u>Immigration Consequences of Pleading Guilty</u>

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4.      <u>Sentencing Information</u>

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.      <u>Financial Disclosures</u>

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that her financial statement and disclosures will be complete, accurate and truthful and will include all assets in which she has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and

Defendant's Initials A̲͟w̲ᷮᷤ͟          14

obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.    <u>Sentencing Recommendations</u>

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether

or not such decision is consistent with the government's recommendations contained herein.

7.    <u>Defendant's Waiver of Right to Appeal the Sentence</u>

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.    <u>Middle District of Florida Agreement</u>

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

Defendant's Initials _____    16

9.    Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.    Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or

Defendant's Initials _____    17

offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.    Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

12.    Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13. <u>Certification</u>

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this \_\_24th\_\_ day of July, 2025.

GREGORY W. KEHOE
United States Attorney

RUBY GEORGE
Defendant

KELLY S. MILLIRON
Assistant United States Attorney

REID M. HART
Defendant

A. TYSEN DUVA
Assistant United States Attorney

JOHN M. PHILLIPS
Attorney for Defendant

MICHAEL J. COOLICAN
Assistant United States Attorney
Deputy Chief, Jacksonville Division

Defendant's Initials\_\_\_\_\_                    19

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.

CASE NO. 3:24-cr-251-MMH-SJH

RUBY GEORGE

## PERSONALIZATION OF ELEMENTS

**Count One**

1.      Between in or about 2013 and late 2022, in the Middle District of Florida, did you and Teresa Brady try to accomplish a common and unlawful plan to violate 18 U.S.C. §§ 1341 and 1343, that is, to execute a scheme or artifice to defraud Duval Teachers United (DTU), or to obtain money or property from DTU by using false pretenses, representations, or promises?

2.      Did you know the unlawful plan's purpose and willfully join in?

**Count Five**

1.      On November 20, 2020, did you transmit or cause to be transmitted a deposit of DTU check number 31113 in the amount of $24,015.63 from a DTU Truist Bank account ending in 0325 into your personal account at Fifth Third Bank?

2.      Did you do so as part of a scheme or artifice to defraud DTU, or to obtain money or property from DTU by using false pretenses, representations, or promises?

3.      Did you falsely represent that the payment was for accrued leave, when in fact, you had no accrued leave?

Defendant's Initials

**Count Twelve**

1.    On August 15, 2022, did you deposit or cause to be deposited into the United States mail or a private and commercial interstate carrier, a DTU Financial Statement for Fiscal Year 2021, to be sent to the Florida Public Employee Relations Commission (PERC) from Jacksonville, Florida?

2.    Did you do so as part of a scheme or artifice to defraud DTU, or to obtain money or property from DTU by using false pretenses, representations, or promises?

3.    Was the DTU financial statement false because it hid and concealed the true nature of the payments that you and Teresa Brady received for unaccrued and unearned leave?

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

     v.                              CASE NO. 3:24-cr-251-MMH-SJH

RUBY GEORGE

## FACTUAL BASIS[*]

From 2013 through 2022, the defendant, RUBY GEORGE, conspired with co-defendant, TERESA BRADY, in a scheme to defraud Duval Teachers United (DTU), the labor union where they both worked, by taking money from DTU. They carried out their agreement by making payments to themselves for unaccrued and unearned leave, bonuses, and reimbursements. They concealed their decade-long scheme by signing checks and authorizing payments to one another, lying to DTU's auditor, misrepresenting their leave balances and incomes to the DTU Board of Directors, and falsely reporting their payments from DTU to the Florida Public Employee Relations Commission (PERC). The following constitutes a summary of some of those events, persons involved, and related information.

---

[*] The Factual Basis is prepared by the United States. The factual basis does not include all pertinent or known facts concerning the charge and guilty plea, or all facts that the defendant has knowledge of. The factual basis is merely a set of facts designed to set forth sufficient information that the Court uses to determine if there is indeed a factual basis to accept the defendant's guilty plea.

Defendant's Initials _____

## DTU's Background

DTU is a labor union that represents Duval County Public Schools (DCPS) teachers, paraprofessionals, and office personnel. DTU began in 1974 when several groups joined together to represent the interests of teachers in Duval County, Florida. Three chapters compose DTU: the Teacher Chapter, the Paraprofessional Chapter, and the United Office Personnel of Duval Chapter. Now, DTU has approximately 6,500 members and represents eighty percent (80%) of eligible DCPS employees. Dues-paying members fund DTU's annual revenue of approximately $5 million. DTU's mission focuses on improving public education by supporting and empowering those who provide that education.

From 1999 to September 2023, GEORGE served as the Executive Vice President of DTU. Before, she acted as a staff consultant for DTU from 1995 to 1999. From 1999 to October 2023, BRADY served as the President of DTU. She acted as a staff consultant before, from 1987 to 1999. GEORGE and BRADY worked together for 28 years at DTU's office located in Jacksonville, Florida.

In addition to the President and Executive Vice President positions, DTU had six other paid positions, including two attorneys, three staff consultants, and a receptionist. DTU had a Board of Directors (Board) of approximately twenty-six members comprised of DCPS teachers, paraprofessionals, and office personnel. A Board Member also held the Secretary/Treasurer position. All Board Members, including the Secretary/Treasurer, volunteered their time and normally met monthly.

Defendant's Initials _____    2

DTU was governed by a set of Bylaws, which set forth, among other things, the executive compensation of the President and Executive Vice President. The President's compensation was based on the highest step of the 10-month teacher contract, extended for two additional months, plus a presidential supplement of $5,000. The Executive Vice President's salary was ninety percent (90%) of the President's compensation. This compensation structure never changed while GEORGE and BRADY held their executive positions.

### DTU's Leave Policy

DTU employees, including the President and Executive Vice President, accrued forty-two (42) leave days per year. Accrued leave days rolled over from one year to the next. There was no cap on the amount of accrued leave that DTU employees could sell back to DTU at a rate equivalent to their hourly pay. In her role as Executive Vice President, GEORGE received leave request forms from staff members and approved or denied their requests.

GEORGE tracked her own accrued leave. BRADY tracked her own leave. As part of GEORGE's role, she submitted or caused to be submitted information to DTU's payroll processing company, Paychex, which in turn, generated the payroll and payments for all DTU staff, including leave and reimbursement payouts.

### The Conspiracy

Beginning in the early 2000's, GEORGE and BRADY began selling their respective accrued leave hours back to DTU. At that time, both had accrued substantial leave from their former staff consultant positions. They each amassed a

Defendant's Initials _____        3

substantial amount of accrued leave hours. However, around 2007, both began selling accrued leave back at much higher quantities to DTU. For example, in 2008, GEORGE sold back 928 hours, which is equivalent to 116 accrued leave days. In that same year, BRADY sold back 945.3 hours, which is equivalent to about 118 accrued days. Then, they kept going.

By 2013, GEORGE and BRADY sold back leave they never accrued nor earned. In 2013, GEORGE sold back 2,872 hours, which is equivalent to 359 working days. The following chart depicts the unaccrued and unearned leave she sold back from 2013 through 2022:

| Year | Leave Earned in Hours | Hours Used | Hours Sold | Leave Transferred | Total Hours Used/Sold | Available Leave Balance in Hours | Leave Balance Converted to Days |
|------|------|------|------|------|------|------|------|
| 2013 | 336 | | 2872 | | 2872 | -4299 | -537 |
| 2014 | 336 | | 2058 | | 2058 | -6021 | -753 |
| 2015 | 336 | | 2576 | | 2576 | -8261 | -1033 |
| 2016 | 336 | | 1416 | | 1416 | -9341 | -1168 |
| 2017 | 336 | | 3656 | | 3656 | -12661 | -1583 |
| 2018 | 336 | | 1856 | | 1856 | -14181 | -1773 |
| 2019 | 336 | | 2656 | | 2656 | -16501 | -2063 |
| 2020 | 336 | | 2189.26 | | 2189 | -18354 | -2294 |
| 2021 | 336 | | 336 | 776 | 1112 | -19130 | -2391 |
| 2022 | 336 | | 1312 | | 1312 | -20106 | -2513 |
| Totals | 3,360 | 0 | 20927.26 | 776 | 21703 | | |

In lockstep with GEORGE, BRADY sold similar amounts of leave that she neither accrued nor earned to DTU from 2013 through 2022. The following chart depicts the unaccrued and unearned leave she sold back from 2013 through 2022:

Defendant's Initials _ALG_                    4

| Year | Leave Earned in Hours | Hours Used | Hours Sold | Total Hours Used/Sold | Available Leave Balance in Hours | Leave Balance Converted to Days |
|------|------|------|------|------|------|------|
| 2013 | 336 | | 2672 | 2672 | -2119 | -265 |
| 2014 | 336 | | 1936 | 1936 | -3719 | -465 |
| 2015 | 336 | | 3148 | 3148 | -6531 | -816 |
| 2016 | 336 | | 1976 | 1976 | -8171 | -1021 |
| 2017 | 336 | 16 | 4736 | 4752 | -12587 | -1573 |
| 2018 | 336 | 40 | 2284 | 2324 | -14575 | -1822 |
| 2019 | 336 | 24 | 1816 | 1840 | -16079 | -2010 |
| 2020 | 336 | | 2152 | 2152 | -17895 | -2237 |
| 2021 | 336 | | 566 | 566 | -18125 | -2266 |
| 2022 | 336 | | 1392 | 1392 | -19181 | -2398 |
| Totals | 3,360 | 80 | 22,678 | 22,758 | | |

GEORGE and BRADY accomplished this fraudulent scheme without detection for so long because they worked together exclusively when paying themselves and concealing the fraudulent payments from others. When writing checks for purported leave payouts, bonuses, and reimbursements, GEORGE and BRADY exclusively signed the checks, authorizing the fraudulent payments for one another. Each then deposited those checks into their personal accounts and caused the electronic clearing of those checks through the interstate banking system, which included DTU's Truist Bank account. For example, on or about March 23, 2018, BRADY signed a check in the amount of $50,000, paid from DTU's bank account to GEORGE, for a purported "bonus." BRADY received a direct deposit in the same amount on or about the same day for a purported "bonus," too, which George authorized. No other person signed the checks, and no Board Member ever authorized or knew about the purported bonuses GEORGE and BRADY caused to be paid to another.

Defendant's Initials _____        5

Additionally, GEORGE and BRADY made payments or caused payments to be made to themselves as purported leave payouts, bonuses, and reimbursements, by conferring with each other about the payments, and then GEORGE contacting Paychex to authorize the payment, which caused interstate electronic transfers of funds for unaccrued and unearned leave from DTU's Truist Bank account to be deposited directly into their respective personal accounts. For example, at several times during the conspiracy, BRADY provided papers to GEORGE that contained a specific dollar amount, which was consistent with BRADY requesting an improper bonus or reimbursement, or a check or payment for unaccrued leave. At BRADY's request, GEORGE authorized a payment to BRADY in the amount requested for a commensurate amount, either through Paychex or by check. Oftentimes, GEORGE received payments in similar amounts around the same time. Again, these payments were made under the guise of cashing in "accrued leave," "bonuses," or "reimbursements," to which neither GEORGE nor BRADY were entitled.

As an example of GEORGE and BRADY receiving fraudulent payments in similar amounts within days of one another, on February 26, 2020, a check (#30776) for $39,189.08 from a DTU Truist Bank account (ending in 0325) was deposited into BRADY's personal Bank of America account. Two days later, GEORGE deposited a check (#30775) for a similar amount, $37,887.83, from the DTU Truist Bank Account into her personal Fifth Third account. These deposits caused interstate wire transfers of the funds through servers not located in Florida. On November 20, 2020, both GEORGE and BRADY deposited checks in commensurate amounts from the DTU

Defendant's Initials _____    6

Truist account. GEORGE deposited a check (#31113) for $24,015.63 into her personal Fifth Third account; BRADY deposited a check (#31112) for $26,690.54 into her personal Bank of America account. On July 19, 2022, GEORGE received a direct deposit into her personal Community First Credit Union account from the DTU Truist Bank account for $13,658.27. On that day and the following day, BRADY received direct deposits totaling $16,209.54 split between her personal Community First Credit Union account ($1,500.00) and her personal Bank of America account ($14,709.54). Each transaction caused interstate wire transfers through servers not located in Florida.

To effectuate the conspiracy, none of these payments for unaccrued leave, unearned bonuses, or fake reimbursements were disclosed to the DTU Board or authorized by anyone other than GEORGE and BRADY. No other DTU employee or Board Member, including the Secretary/Treasurer, signed the checks for those payments, nor the direct payments through Paychex, caused by GEORGE and BRADY as part of their scheme.

### False Representations to DTU Auditor

In 2017, DTU retained a Certified Public Accountant to perform an annual audit on DTU's financial condition pursuant to the Bylaws. The DTU Auditor requested GEORGE and BRADY's accrued leave balances for his analysis for Fiscal Year 2016. In turn, GEORGE provided false accrued leave balances to the Auditor. Specifically, she provided BRADY's accrued leave balance as 753 days, which BRADY provided GEORGE, and her own accrued leave balance as 601 days. In

Defendant's Initials _____          7

reality, each had long run out of accrued leave and were then in the negative. Based on the fraudulent payments they received, BRADY had a deficit of 959 leave days and GEORGE had a deficit of 1,096 leave days in Fiscal Year 2016—not a surplus.

The false figures that GEORGE provided the Auditor underpinned his annual audits for the following seven years. After Fiscal Year 2016, GEORGE provided leave balances for all DTU employees except GEORGE and BRADY in an attempt to hide their leave scheme. This concealment prompted the Auditor to create a schedule for tracking their leave balances using DTU's payroll records. Based on the schedule, the Auditor identified that GEORGE and BRADY cashed out more accrued leave than they had saved, even based on the fraudulent figures that misrepresented a surplus of accrued leave provided by GEORGE and BRADY in 2017. When the Auditor raised the matter, GEORGE and BRADY misrepresented that the final amount of accrued leave was still being determined by the DTU Board, even though the annual accrual rate of 42 days per year remained the same. As part of concealing any issues regarding their leave balances and fraudulent payments, GEORGE and BRADY never permitted the Auditor to attend any Board meetings to present his findings, nor did they permit the Board to keep copies of his annual reports outside of the monthly Board meetings.

### False Representations to DTU Board

Moreover, at monthly Board meetings, GEORGE and BRADY lied to the Board about their accrued leave balances and obfuscated questions about selling that leave. Like to the Auditor, GEORGE and BRADY represented that they retained a

Defendant's Initials _____    8

large bank of accrued leave from their decades of employment, making the leave balances a financial liability for the organization. When misrepresenting their leave balances to the Board, GEORGE and BRADY never told the Board specifically how much accrued leave they had nor how much they sold back to DTU. Instead, they vaguely reported they had large amounts of leave and obscured any specific information about their leave to conceal their conspiracy. At one point during the conspiracy, GEORGE told the DTU Secretary/Treasurer specific figures of how much accrued leave she had, but those numbers were fabricated. At multiple meetings, one Board member asked questions about the false leave balances and requested the specific figures, which GEORGE and BRADY indicated they would provide, but never did.

Additionally, to conceal their fraud, GEORGE and BRADY never permitted Board members to keep copies of DTU's financial statements. Instead, GEORGE and BRADY provided copies for review only during monthly Board meetings and collected them at the end of the meetings. In DTU's annual financial statements, GEORGE and BRADY concealed payments made to them in a general line item for salaries and payroll taxes—they never identified any specific payments made to themselves for unaccrued leave, unearned bonuses, or purported reimbursements, to the Board. Moreover, the Board never awarded GEORGE nor BRADY any additional leave beyond the allotted 42 days per year, nor any bonus payments outside of their salaries.

Defendant's Initials ⟨signature⟩            9

## False Financial Statements to PERC

Due to DTU's mission as a labor union representing public employees, it was required to register with PERC. PERC is an independent, quasi-judicial agency with the state of Florida that primarily mediates public sector labor and employment disputes. Each year, DTU was required to file two documents with PERC: an (1) Employee Organization Registration, and an (2) Employee Organization Annual Financial Statement. The Employee Organization Annual Financial Statement required certification of executive compensation for the previous fiscal year. PERC required DTU's President and Treasurer to sign these documents and swear that the representations contained therein were "true, correct and complete to the best of their knowledge and belief."

On the Annual Financial Statements mailed to PERC for DTU fiscal years 2019, 2020, and 2021, BRADY certified each Statement. As Executive Vice President, GEORGE assisted BRADY in providing financial information. Each Statement reported salaries, allowances, and disbursements to GEORGE and BRADY specifically. They misrepresented their payments by not including in the total amounts any fraudulent payments they made or authorized for one another.

On the Statement for Fiscal Year 2019, mailed on or about July 23, 2020, BRADY reported her salary as $150,467.20 and reimbursed expenses as $5,000. In reality, she received payments from DTU totaling $279,511.24. GEORGE similarly reported her salary as $136,158.88 and reimbursed expenses as $5,000, when in reality, she received payments from DTU totaling $256,572.09. On the Statement for Fiscal

Defendant's Initials _____    10

Year 2020, mailed on or about August 9, 2021, BRADY reported her salary as $151,286.72 and reimbursed expenses as $5,000. In reality, she received payments from DTU totaling $352,788.84. GEORGE similarly reported her salary as $136,158.88 and reimbursed expenses as $5,000, when in reality, she received payments from DTU totaling $323,762.19. On the Statement for Fiscal Year 2021, mailed on or about August 15, 2022, BRADY reported her salary as $151,286.72 and reimbursed expenses as $5,000. In reality, she received payments from DTU totaling $207,109.14. GEORGE similarly reported her salary as $136,158.88 and reimbursed expenses as $5,000, when in reality, she received payments from DTU totaling $177,343.28. Each of these Statements were mailed to the Florida PERC office via the United States Mail or private and commercial interstate carrier. In making these false statements to PERC, GEORGE and BRADY hid their scheme—specifically, the payments they received because of their fraud—from public scrutiny.

### The Fraudulently Obtained Money

Over the decade-long conspiracy, GEORGE and BRADY each obtained over $1.2 million apiece by selling back to DTU leave that they had not accrued and did not earn, along with paying themselves purported bonuses and reimbursements to mask their fraud. In total, they fraudulently acquired $2,600,235.99 from DTU. Specifically, GEORGE obtained at least $1,271,540.71, and BRADY obtained at least $1,328,695.28, as a result of their scheme. The conspiracy ended not long before GEORGE and BRADY retired in the fall of 2023—around the same time a search warrant was executed on DTU's office.

Defendant's Initials _____    11